Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlawgroup.com*
Cory T. Salisbury (SBN 282077) *cs@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Fe Simonette Muncan

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| FE SIMONETTE MUNCAN, | Case No.: |
| Plaintiff, | Action Filed: |
| vs. | Trial Date: None |
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10, inclusive, | COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PREJUDGMENT INTEREST AND ATTORNEYS' FEES |
| Defendants. | [Filed Concurrently With:<br>- Summons;<br>- Certification and Notice of Interested Parties; and<br>- Civil Case Cover Sheet] |

### NATURE OF ACTION

1.    This case involves the tragic death at 57 years old of Doru Muncan ("Doru" or "Mr. Muncan").  Doru rose from bed to use the restroom during the night and fell, hitting his head against the floor, suffering a significant trauma that caused an intracerebral hemorrhage.  Doru died three days later after being treated in the hospital for the intracerebral hemorrhage.  His wife, Plaintiff Fe Simonette Muncan ("Fe Simonette" or "Mrs. Muncan") had obtained accidental death and dismemberment ("AD&D") coverage on Doru's life through an employee welfare benefit plan ("Plan") offered by her employer, Encompass Health Corporation ("Encompass").  The coverage was funded by a group insurance policy issued by defendant The Lincoln National Life Insurance Company ("Lincoln") to Encompass for the benefit of its employees and employees' spouses, group policy number SA3-890-LF0216-01 ("Policy").  Following Doru's death, Fe Simonette submitted a claim with Lincoln for AD&D benefits.  Lincoln denied Fe Simonette's claim, improperly invoking a provision in the Policy that excludes coverage for deaths caused or contributed to by the use of alcohol based on nothing more than the presence of alcohol in Doru's blood at the time of his fall.  The evidence clearly establishes that Doru's death was caused by the intracerebral hemorrhage he suffered when he fell, and that his fall was not caused by the use of alcohol.  In fact, he had developed a functional tolerance to alcohol over years of chronic alcohol use.  Therefore, his death is covered by the Policy as interpreted by Ninth Circuit precedent, *Dowdy v. Metropolitan Life Insurance Company,* 890 F.3d 802 (9th Cir. 2018), and other applicable caselaw.

2.    Fe Simonette brings this action to recover AD&D insurance benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).

-1-

Case No.:

## **THE PARTIES**

3.     Plaintiff Fe Simonette Muncan is an individual who, at all times relevant to this action, was a citizen and resident of the State of California, residing in Anaheim, California, which is in the County of Orange.  At all times relevant to this action, Mrs. Muncan was a participant and beneficiary, as defined by ERISA section 3(8), 29 U.S.C. section 1002(8), in the employee welfare benefit plan established by her employer, Encompass, which is at issue in this action.

4.     Mrs. Muncan is the duly appointed, qualified and acting administrator of the decedent, Mr. Muncan's estate.

5.     Defendant Lincoln is and at all times relevant was a Pennsylvania corporation with its principal place of business in Pennsylvania duly authorized to do and doing business within the Judicial District of the Central District Court of California, namely issuing group life and accidental death insurance policies to employers there, including Encompass.  Defendant Lincoln is and at all relevant times was an ERISA plan fiduciary.  Lincoln funded the Encompass employee welfare benefit plan and administered benefits provided to Encompass employees and their beneficiaries, including Fe Simonette, by issuing the Policy to Encompass and through it insuring employees of Encompass, including AD&D coverage. Lincoln acted as the claims administrator for Fe Simonette's accidental death insurance claim and generally for accidental death insurance claims made under the Policy and the Plan.  Lincoln acted as a plan administrator in connection with the Policy.

6.     The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Mrs. Muncan at this time, who therefore sues DOES 1 through 10 by

Case No.:

fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of such principals, and all the acts performed by them were within the course and scope of their authority and employment. Mrs. Muncan is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events and happenings referred to herein, and directly and proximately caused the damages and injuries to Mrs. Muncan as hereinafter alleged.

## **JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over Mrs. Muncan's claims pursuant to ERISA section 502(e) and (f), 29 U.S.C. section 1132(e) and (f) and 28 U.S.C. section 1331. It also has diversity jurisdiction under 28 U.S.C. section 1332 because Mrs. Muncan and Lincoln are citizens of different states (California and Pennsylvania, respectively) and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      Venue lies in the Central District of California, Southern Division pursuant to ERISA section 502(e)(2), 29 U.S.C. section 1132(e)(2), because Mrs. Muncan resides in this district, some of the breaches alleged occurred in this district and the ERISA-governed plan at issue was administered in part in this district. Venue is also proper pursuant to 28 U.S.C. section 1391(b) because a substantial part of the events or omissions giving rise to Mrs. Muncan's claim occurred within this district. Namely, Lincoln denied Mrs. Muncan's claim in Anaheim, County of Orange, California within this district.

Case No.:



1

## FACTUAL BACKGROUND

2   9.   At the time of Doru's death, the Muncans' arrangement was that Fe

3   Simonette worked full time and financially supported the family, while Doru

4   transported their son to and from school, appointments with doctors, dentists,

5   orthodontists and music teachers, and managed the household.

6

7   10.   Fe Simonette worked at Encompass and had enrolled in the Plan.  She

8   elected AD&D coverage for both her and Doru, as offered by the Plan.  Fe

9   Simonette was named as the sole beneficiary to the Policy for the life coverage and

10  AD&D coverage in the event that he suffered an accident that resulted in his death,

11  in the amount of for $300,000.

12

13  11.   The Policy includes the following accidental death insuring provision

14  and pertinent exclusion:

15  **Benefits**

16  Accidental Death and Dismemberment benefits are payable when a
    Covered Person suffers a loss solely as the result of accidental Injury

17  that occurs while covered.  The loss must occur within 365 days after
    the date of the accident.

18

19  **ACCIDENTAL DEATH AND DISMEMBERMENT
    EXCLUSIONS**

20  No benefits are payable for any loss that is contributed to or caused by:

21  (11)   the presence of alcohol in the Covered Person's blood which
    raises a presumption that the Covered Person was under the influence of

22  alcohol and contributed to the cause of the accident.  The blood alcohol level
    is governed by the jurisdiction of the state in which the accident occurred.

23

24  12.   Doru suffered from chronic alcohol addiction.  He had been drinking

25  consistently for several years, since he was 16 years old, with two exceptions when

26  he temporarily stopped drinking and attempted to rehabilitate himself, but both

27  times he reverted back to drinking.

28



13.    By the time of his death, Doru had developed a strong tolerance to alcohol.  His routine was to drink approximately a case of light beer over the course of each day.  He drank between ten and fifteen 12 oz. cans of beer each day.  He was usually awake by about 6:00 a.m.  He drank one to two beers early in the morning, because if he did not, his body would become shaky from the effects of withdrawal.  Then from late morning until he went to bed around 10 p.m., he drank approximately one beer per hour.  His drinking on the day prior to his fall was consistent with this routine.

14.    Doru had developed a tolerance to alcohol such that he required much more alcohol than an average person to become impaired.  For several years, he functioned normally despite his alcoholism.  He drank enough each day to satisfy his physical addiction but did not drink to the point that he was impaired, with very few exceptions.

15.    By all accounts, Doru maintained his household, transported his child around town, and generally moved through life without impediment from his drinking.  He regularly interacted with several people, including his son's teachers and school staff, music teacher, dentist and orthodontist, his neighbors, and many people at his church.  He completed household chores daily.  He never gave any indication that he was intoxicated or impaired, as evidenced by numerous personal witness statements submitted to Lincoln.

16.    June 27, 2021 was a normal Sunday for Doru.  He rose from bed in the morning and did some household chores, saw Fe Simonette off to work, went to church with his son, then spent the rest of the day lounging in his living room watching television.  He went to bed around 9:40 p.m.  The Muncans had video cameras inside and outside their home that show Doru walking around inside and

Case No.:

outside the house throughout the day.  Video clips taken that day did not show in any manner that Doru appeared to be intoxicated or impaired.  Rather, video clips indicate that he was walking and moving around normally in the same manner as he always did, and in a manner a non-intoxicated, non-impaired person would walk and move around.

17.     In the early hours of June 28, 2021, Doru rose from bed to use the restroom.  Because he took medication at bedtime, this was a regular routine for him.  At about 3:00 a.m., Fe Simonette was awakened by the sound of a thud in the hallway near the bathroom.  She got out of bed and found Doru lying on the floor.  Their son also heard the thud and came into the hallways as well.  Fe Simonette and her son helped Doru up and back to bed.  Despite his history of drinking, **he had no prior history of falls and had never fallen on his way to the restroom prior to this time.**

18.     Fe Simonette, a registered nurse, examined Doru.  He was not bleeding, but he had a bump on the back right side of his head.  She asked Doru if he wanted her to call 911 or take him to an emergency room, but he declined, stating that he wanted to go back to sleep, so they got back into bed.  Before falling sleep, they discussed their plans for the next day, as it was Fe Simonette's day off work.  After about 15 minutes, they fell asleep.

19.     Fe Simonette awoke again approximately two hours later, around 5:00 a.m., to find Doru having a seizure.  She immediately called 911 and paramedics arrived 15 minutes later.  He appeared to Fe Simonette to be visibly half asleep.  Fe Simonette told the paramedics that Doru had a history of chronic alcohol use, so that they could communicate this information to the ER doctors in order to properly manage Doru's medical care.  She did not tell the paramedics or anyone else that



Doru had a heavy night of drinking the previous night (because he did not, just his normal consumption).  She remained at home with her son.

20.     The paramedics took Doru to Anaheim Regional Medical Center ("Anaheim Regional"), the nearest hospital to the Muncans' home.  Upon admission, Doru's blood was tested and indicated elevated liver enzyme levels and blood alcohol content ("BAC") of 184 mg/dL, which is equivalent to .18%.

21.     Fe Simonette received a call from the ER doctor at Anaheim Regional around 6:30 a.m. informing her that Doru was being transferred to UCI Medical Center ("UCI") for a higher level of care due to an intracerebral hemorrhage.  The ER doctor did not ask Fe Simonette any questions about Doru's history or what happened that night.

22.     According to the Anaheim Regional records, Dr. Edward Lee noted that Doru "appeared to have multiple trauma" which was evidenced by abrasions of his anterior thorax.  Later CT scans were performed at UCI that showed subcutaneous contusions of the anterior chest wall and support these findings.

23.     Doru was transferred to UCI around 7:30 a.m.  At 8:27 a.m., Doru had a CT scan of his head, neck, and cervical spine, which indicated the following:

● Large volume traumatic intraventricular hemorrhage with possible active contrast extravasation the left lateral ventricle.  Associated hydrocephalus and 1.7 cm rightward midline shift.  Per chart review, intracranial hemorrhage is a known finding from recent outside imaging with prior imaging not available at the time of dictation;

● No acute cervical spine fracture.  Prevertebral edema that is likely related to intubation.  Consider MRI cervical spine if there are high clinical concerns

-7-



1    for cervical spinal injury;

2    ● Age-indeterminate multifocal severe-critical stenoses of the left vertebral

3    artery V4 segment;

4    ● Cervical atherosclerotic disease with mild bilateral ICA, mild right

5    vertebral artery origin, and moderate-severe left vertebral artery origin

6    stenosis;

7    ● Asymmetric mildly decreased caliber of the right intracranial ICA that may

8    reflect variant nature, mild atherosclerotic related stenosis, or less likely

9    vasospasm.

10

11    24.    Doru's blood was also tested again upon admission to UCI, which test

12    indicated normalizing liver enzyme levels.

13

14    25.    Fe Simonette received a call from the doctors in the UCI intensive care

15    unit around 11:00 a.m. and was interviewed about Doru's history and the incident.

16    The doctor asked Fe Simonette whether Doru had a family history of aneurysm or

17    stroke, and she answered that he did not.

18

19    26.    Over the course of the next three days, Fe Simonette had several

20    meetings with the doctors at UCI.  During this time, Doru's condition deteriorated

21    due to increasing pressure on his brain from the traumatic hemorrhage.  The doctors

22    did several CT scans of Doru's brain during these three days, which revealed:

23

24    Extensive, acute intraventricular hemorrhage resulting in ventricular
      dilatation.  Small amount of periventricular intraparenchymal
      hemorrhage, particularly along the posterior aspect of the lateral

25    ventricles.  Approximate 10 mm left-to-right midline shift of the
      septum pellucidum.  No discrete parenchymal herniation identified at

26    this time.

27

28    27.    Jeremy Guinn, M.D. provided notes in the context of performing

-8-



neurosurgery on Doru.  Dr. Guinn stated Doru "has a very poor neurological exam. He has a good amount of hemorrhage into the brain with blood in all of the ventricles."  On June 28, 2021, Dr. Guinn listed both the pre-procedure and post-procedure diagnoses as "intraventricular hemorrhage."

28.    A CT scan on June 30, 2021 revealed "stable severe intraventricular hemorrhage with transependymal edema" as well as "stable trace subarachnoid versus parenchymal hemorrhage in the right frontal lobe and left cerebellar hemisphere."  The following day, July 1, 2021, Lucas Puttock, D.O. listed Doru's principal problem as "Intracerebral IVH (intraventricular hemorrhage)."  Doru's final diagnoses included "*traumatic* hemorrhage of left cerebrum with loss of consciousness of unspecified duration." (Emphasis added).

29.    Tragically, Doru passed away on July 1, 2021.  His death was caused by an acute traumatic intracerebral intraventricular hemorrhage resulting from his fall.

30.    The UCI Discharge Summary lists Doru's principal diagnoses as "acute traumatic intracerebral (intraventricular) hemorrhage due to ground level fall."  The Impressions in the UCI records include "large volume intraventricular hemorrhage," "persistent severe intraventricular hemorrhage," and "no significant change of the large volume multicompartment intracranial hemorrhage and associated mass effect."

31.    Doru's death certificate lists the immediate cause of death as "acute traumatic intracerebral intraventricular hemorrhage," with secondary causes being "ground level fall – unwitnessed" and "chronic alcohol abuse," respectively.

32.     Prior to his death, Doru had annual medical check-ups for preventive purposes, and his lab results were always in the normal range.

33.     Fe Simonette made a claim with Lincoln for life and AD&D benefits pursuant to the Policy.  Lincoln paid the life insurance death benefits, but it sent Fe Simonette a letter dated October 22, 2021 informing her that her AD&D claim was denied based on the Policy's alcohol exclusion.  Notably, in its denial letter, Lincoln explained that the exclusion applied based on vague and generalized information that did not apply specifically to Doru.  Lincoln stated:

> The postmortem blood findings concluded that Mr. Doru Muncan's blood ethanol was a blood alcohol content of 0.184%.  The claim was reviewed by a Certified Internal Physician who indicated at blood alcohol concentrations about 0.16%, speech, memory, coordination, attention, reaction time, muscle control and balance are significantly impaired, and judgment and decision making are dangerously impaired.  Therefore, alcohol caused or, at a minimum, contributed to the cause of death.  As such, we have determined that no Accidental death benefits are payable as outlined in the #11 exclusion of the Policy.

Lincoln reasoned that because Doru had alcohol in his system at the time of his fall, his hemorrhage therefore must have been caused by his alcohol use.  However, Lincoln did not explain how it determined this, other than providing vague data indicating that alcohol use can possibly have such effects in some people.

34.     On October 1, 2021, Lincoln referred Doru's file to Peggy Geimer, M.D., FACOEM for review.  Dr. Geimer is an occupational and environmental health consultant whose focus is consulting for clients above environmental and workplace health programs.  The last time she practiced medicine at a hospital as an attending staff member was four decades ago in 1980.  Dr. Geimer provided a report dated October 19, 2021 in which she concluded that "chronic alcoholism caused or contributed to Mr. Muncan's death."

Case No.:



35.    Dr. Geimer's "analysis" of Doru's lab report was non-existent.  She did nothing other than state Doru's BAC and make conclusory, general statements about the effects alcohol can have on people.  For example, Dr. Geimer stated in her report that:

> Blood alcohol concentrations greater than 0.05% cause a state of increased euphoria, exaggerated behavior, reduced coordination, impaired attention, balance and increased risk of injury to self and others.  Blood alcohol concentrations greater than 0.08% further impair coordination, concentration, and perception, and reduce information processing capability.  At blood alcohol concentrations above 0.16%, speech, memory, coordination, attention, reaction time, muscle control and balance are significantly impaired, and judgment and decision making are dangerously impaired.  Elevated blood alcohol concentration caused or contributed to decedent's head injury and subsequent death.

36.    Dr. Geimer concluded that because Doru had alcohol in his blood, and alcohol can have these effects on a hypothetical person, that therefore alcohol had these effects on Doru.  However, Dr. Geimer did not consider Doru's history of chronic alcohol use and associated level of tolerance, health, diet, physical size, environment, video clips of Doru, personal statements from witnesses, his lack of any history of falls, or any other factors specific to Doru.  Dr. Geimer's conclusion is based solely on generalized possible effects of alcohol on people in general and therefore should not have been used by Lincoln to support its position that Doru's fall was caused by alcohol.

37.    In reaching her conclusion, Dr. Geimer reviewed only Doru's death certificate and the medical records from Anaheim Regional and UCI.  *She expressly states in her report that she ignored all of Doru's medical and pharmacy records prior to those from Anaheim Regional and UCI from June 28, 2021 through July 1, 2021.*  She did not speak with Fe Simonette or review Fe Simonette's statements as to the inaccuracies present in the medical records.  She did not have any information about Doru's extensive history of chronic alcoholism and how it may have impacted



his tolerance.  Nor did she review any information related to how alcohol tolerance can affect the impact of alcohol on a person, let alone Doru in particular.

38.     Dr. Geimer highlighted in her report the inaccurate statement that Doru had a heavy night of drinking on the relevant night, but she did not mention the fact that Doru fell.  Dr. Geimer ignored that crucial fact.  She only included in her report that Doru rose from bed to use the restroom, then began seizing when he went back in bed.  She left out the fall.  This description so grossly misstates the facts that the only plausible explanation is that Dr. Geimer made an active effort in writing her report to provide Lincoln with a favorable report without any regard for the truth or the reality of what Doru experienced.  This is demonstrated by the fact that in summarizing the UCI medical records, Dr. Geimer recited Doru's principal diagnosis at death, which was acute traumatic intracerebral hemorrhage **due to ground level fall**.  She also summarized Doru's death certificate, which provides that the cause of Doru's death was the same - acute traumatic intracerebral hemorrhage **due to ground level fall**, and also states that Doru's injury was **caused by a fall**.  Despite reciting these integral facts, Dr. Geimer completely omitted them from her conclusion.  There are very few possible explanations for this: either Dr. Geimer was so careless in preparing her report that she unintentionally omitted these crucial facts, or she was so focused on providing Lincoln with a favorable report that she willfully omitted them.  Either of these explanations renders Dr. Geimer's report grossly insufficient and substandard, and it should not be considered in this matter for any purpose other than to demonstrate that Lincoln's method in reviewing Fe Simonette's claim was to obtain a report favorable to its position, without regard for the truth, the facts of the matter, the relevant experience of its consultant, or medical integrity.

39.     Fe Simonette appealed Lincoln's decision on June 22, 2022.  In her

Case No.:

appeal, Fe Simonette pointed out to Lincoln that several pieces of information in Lincoln's review of the claim were incorrect.  For example, the medical records indicated that the paramedics who arrived on the scene had been told that Doru had "a heavy night of drinking" the night before his fall, which was not true.  As explained above, Fe Simonette told the dispatcher that Doru had a history of chronic alcohol use.  It is unknown how the idea that Doru had "a heavy night of drinking" the night before came to be.

40.    Fe Simonette's appeal also included a report from Anne Nafziger, M.D., Ph.D., MHS, FACP, FCCP, in which Dr. Nafziger concluded that because Doru had functional tolerance to alcohol, there was no evidence that he was impaired on the night he fell.  Dr. Nafziger noted that Doru had a normal gait throughout the day prior to his fall, including just before going to bed.  Dr. Nafziger further noted that the rate at which Doru's liver enzymes receded after being elevated indicates that they were elevated for a reason other than alcoholic disease.  If Doru's enzymes were elevated because of alcoholic disease, they would have receded at a slower rate and in a more linear fashion than they did, consistent with the metabolizing of alcohol.  But Doru's enzyme levels receded rapidly, indicating some other cause.  Dr. Nafziger concluded with regard to the death certificate:

> The death certificate lists acute traumatic intracerebral intraventricular hemorrhage as the immediate cause of death, ground level fall unwitnessed as an underlying cause of death, and chronic alcohol abuse as a secondary underlying cause of death.  This means that Mr. Muncan died from bleeding in his brain, and his brain hemorrhage (bleeding) was caused by his fall.

Lincoln has not and cannot demonstrate that Doru's fall was caused by his use of alcohol.  Rather, Lincoln simply concluded that because alcohol was present in Doru's blood, his alcohol use, therefore, must have theoretically caused or contributed to his death.

-13-



41.     Dr. Nafziger also discussed Doru's liver enzyme levels.  According to Dr. Nafziger, the difference between Doru's liver enzyme levels when his blood was tested at Anaheim Regional and when it was tested at UCI was significant.  The change in levels indicate that his liver enzyme levels had normalized by the time he got to UCI, which suggests that the earlier findings at Anaheim Regional were due to "hemodynamic changes (affecting liver blood flow) from his seizures and hypoxia" and not from his alcohol use.

42.     Additionally, Dr. Nafziger discussed alcohol consumption and intoxication.  She analyzed video clips of Doru throughout the day prior to his fall from when he was up around 6:00 a.m. to when he went to bed around 9:40 p.m. Dr. Nafziger stated that "these routine surveillance video clips from his home provide evidence that Mr. Muncan did not have impairment of his coordination or gait on the day of his fall" and that, "None of the videos show signs of hand, arm or leg incoordination or a wide-based gait" which would be likely had Doru been impaired.

43.     Dr. Nafziger also discussed the effects of chronic alcohol use, stating:

> [C]hronic alcohol intake can result in hepatitis, cardiovascular consequences (hypertension [high blood pressure] and atrial fibrillation [irregular heart beat]), and hematologic (blood) consequences, including iron deficiency anemia from gastrointestinal blood loss and pancytopenia (low white blood cell count, low red blood cell count, and low platelet count) from alcohol's direct toxic effects on the bone marrow.  Mr. Muncan did not show evidence of any of these sequelae.

That Doru did not display these factors indicates a very high unlikelihood that his alcohol consumption caused his fall.

44.     Dr. Nafziger went on to discuss in detail Doru's tolerance to the effects

of alcohol, which means that after consistent consumption of a constant amount of alcohol, a person will require more alcohol in order to produce the same level of impairment or intoxication.  According to Dr. Nafziger, "[t]olerance results from an increased rate of metabolic elimination (acute or dispositional tolerance) and decreased sensitivity of target issues, especially the central nervous system (functional tolerance)."  She provided a detailed explanation of functional tolerance:

> Functional tolerance is a chronic condition and regarded as a homeostatic physiological adaptation to the presence of alcohol in the brain.  Simply put, functional tolerance is acquired resistance to the effect of alcohol.  This tolerance is reflected in the finding that when an individual who has had repeated experience with alcohol is given a particular dose, the dose produces less of an effect than it would in an alcohol-naïve individual.  Functional tolerance occurs after repeated dosing with alcohol and is most pertinent to this case.  Functional tolerance is defined as resistance to the effects of alcohol at the cellular level and therefore produces less of an effect than it would in an alcohol-naïve individual.  Someone with functional tolerance may show few signs of intoxication even at high blood alcohol concentrations that in other individuals would result in impairment.  Such drinkers do not experience significant behavioral impairment as a result of drinking (e.g., slurred speech, difficulty walking, and decreased inhibitions).  Whereas social drinkers may show signs of intoxication at a BAC of 100 mg/dL, heavy chronic drinkers may not show these signs.  There is considerable variability in the correlation between BAC and behavioral effects or level of intoxication, with documentation of patients who had extremely high BACs (in the range of 0.40% - 0.50% that are considered lethal), who were conscious, able to carry on conversations, and able to engage in physical activities such as walking without support.
> According to the 10th Special report to the US Congress on Alcohol and Health "….This process [tolerance] results in a decrease in the amount of intoxication with time after alcohol drinking or after repeated alcohol drinking sessions, even when the amount of alcohol in the brain is the same as that which would originally have produced intoxication.  For example, a level of brain alcohol that would produce movement problems minutes after beginning drinking will not produce the same severe intoxication hours after drinking was initiated.  Further, in an individual who drinks heavily and often, the amount of intoxication produced by a particular level of alcohol in the brain is less than that in an individual who is drinking for the first time….Tolerance to the effects of alcohol may mediate the risk and severity of injury…"

45.     Dr. Nafziger also discussed the effects of functional tolerance, specifically in the context of Doru's alcohol use:

> When functional tolerance is present, the levels of intoxication implied by a BAC of 184.0 mg/dL that are quoted by Encompass physician,

Case No.:

1  Peggy Geimer MD, would not have resulted in the behaviors and
2  physical consequences listed in her assessment.  Mr. Muncan had
   functional tolerance, and therefore alcohol as the cause of his fall
   cannot be assumed.

3  An important point is that Mr. Muncan did not have evidence of
4  hazardous use of alcohol, defined as injury to self due to drinking,
   injury to someone else due to drinking, property damage due to
5  drinking, or drinking and driving that resulted in legal problems.
   Hazardous use are indicators of impaired control.  From Mrs. Muncan's
6  personal statement it is clear that Doru Muncan did not have evidence
   of hazardous use.  He drove his son to school, piano lessons, medical
7  and dental appointments and was able to do all the housekeeping
   without difficulty.  Lack of hazardous use is further evidence that Mr.
8  Muncan had functional tolerance.

9  As described by Dr. Nafziger, had Doru been impaired by alcohol, he would have

10  displayed some indication of impairment, but he did not.  He drank because he was

11  addicted to alcohol and his earlier attempts to quit drinking had been unsuccessful.

12  He drank enough to avoid suffering from withdrawals.  Ironically, Doru essentially

13  drank beer so that he *could* function normally.

14

15  46.  Lastly, Dr. Nafziger pointed out an additional fatal flaw in Lincoln's

16  review of Fe Simonette's claim, namely its reliance on Dr. Geimer's opinion:

17

18  Dr. Peggy Geimer's opinion, stated in her report to Insurance Co is not
    supported by the evidence. [ ] Dr. Geimer has expertise in
19  environmental and occupational medicine and has devoted her career to
    administration with a focus on developing occupational medicine
20  programs.  Dr. Geimer has not practiced clinical medicine in the past
    39 years.  As such, she is not qualified to provide an opinion on this
21  matter.

22  Dr. Nafziger is correct that Dr. Geimer is not qualified to provide an opinion on this

23  matter, and for Lincoln to rely on Dr. Geimer's opinion demonstrates that its review

24  of Fe Simonette's claim was fatally flawed.

25

26  47.  Furthermore, Fe Simonette's appeal informed Lincoln that even if

27  Lincoln could demonstrate that Doru's fall was caused by his use of alcohol (which

28  it cannot), the Policy's alcohol exclusion would still not apply, because Doru's death

Case No.:

was directly caused by a traumatic brain hemorrhage resulting from the fall, not by Doru's intoxication.  Therefore, Doru's death **is** covered by the Policy, as interpreted by Ninth Circuit precedent, *Dowdy, supra*, despite the Policy language requiring that an accident must be the sole cause of death.  In *Dowdy*, the Ninth Circuit reaffirmed that the "substantial contribution" test must be used to determine if coverage exists under an ERISA AD&D policy where both an accident and a preexisting disease contributed to the insured's loss.  The court held that coverage exists, under a policy containing language that is similar to that in Lincoln's Policy, unless the illness "*substantially* contributed to [the insured's] loss."  *Id.* at 808 (emphasis in original).  It found that a disease merely "contributing to" or "being related to" a loss is not enough to eliminate coverage, despite the policy's language. *Id.* at 809-10.  The court explained that "[i]n order to be considered a substantial contributing factor for the purpose of a provision restricting coverage to direct and sole causes of injury, a pre-existing condition must be more than merely *a* contributing factor."  *Id.* at 809 (emphasis in original).  The court reasoned that "a 'predisposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause.  A mere 'relationship' of undetermined degree is not enough."  *Id.* at 808 (internal citations and parentheticals omitted).

48.     On July 20, 2022 Lincoln referred Doru's file to Marvin Pietruszka, MD for review and Dr. Pietruszka provided a report dated July 28, 2022.  In response to the question of what the likely side effects are to a person with an alcohol concentration of 184 mg/dL (0.184% BAC), Dr. Pietruszka stated:

> Likely side effects to a person with a BAC of 0.184% are significant and include impairments in coordination, balance, attention, concentration, perception, reaction time, muscle control, judgement [sic] and decision making.

In response to a prompt to comment on Doru's chronic alcoholism as related to functional tolerance, Dr. Pietruszka stated:

> Although a history of chronic alcoholism does, with time, result in functional tolerance to the effects of alcohol, functional tolerance does not extend to such significant BAC as in the claimant's cases [sic]. Lesser effects of alcohol can indeed be observed in chronic alcohol users, when compared to a regular person, however, this does not mean that chronic alcohol users are immune to the effects of alcohol. While a chronic alcohol user (such as the claimant) would likely have somewhat lesser effects and impairments resulting from BAC of 0.184%, significant impairments would still be present. There is neither medical evidence, nor any scientific data, assert that the claimant, being a chronic alcohol user, would have no impairments with BAC of 0.184% or that such impairments would be minimal and insignificant. BAC of 0.184% is very significant and results in significant impairments even in chronic alcohol users.

Dr. Pietruszka also stated:

> Dr. Nafziger discusses multiple times that the claimant did not have any issues with his gait or coordination. It is not entirely clear how this is relevant to the case in question, as a person does not need to have chronic alcohol induced functional deficits to have impairing effects of alcohol due to acute alcohol intoxication.

49.     On September 30, 2022 Fe Simonette's counsel responded to Dr. Pietruszka's report. The response discussed the many flaws of Dr. Pietruszka's reasoning and report, including that Dr. Pietruszka did not review all the relevant material, as he did not review any material prior to June 28, 2021. The response pointed out that whereas Dr. Nafziger analyzed Doru's liver enzymes, Dr. Pietruszka did not. Rather, Dr. Pietruszka listed "enzyme activity" as an unknown variable. Likewise, the response explained that Dr. Pietruszka did not address the issue that Doru had never had a fall in many years of chronic alcohol use and getting

Case No.:



1  up in the middle of the night to use the restroom.  The response also discussed that

2  Dr. Pietruszka ignored Fe Simonette's personal statement, in which she correctsed

3  significant misstatements in the medical records.

4

5  50.  Dr. Pietruszka then provided an addendum to his report dated October

6  13, 2022 in which he addressed the video clips of Doru the day prior to his fall.  Dr.

7  Pietruszka grossly misstated the contents of the videos and what they depict.

8  Whereas the videos clearly show Doru moving around his house with no problems,

9  walking in the yard and through the house, sitting and watching television, and other

10  routine activities, Dr. Pietruszka stated that the videos showed Doru "stumbling

11  around," "clearly impaired," and "appearing to be 'out of it.'"

12

13  51.  Lincoln sent another letter dated October 19, 2022 upholding its denial

14  of Fe Simonette's AD&D claim.  In the letter, Lincoln concluded:

15

16  Based on the facts of the case and the terms of the Policy, we have
   determined accidental death benefits are not payable.  We acknowledge

17  Mr. Muncan's history of chronic alcoholism; however, we maintain
   that the totality of the evidence on file supports the conclusion that Mr.

18  Muncan had a blood alcohol level of at least 0.184% at the time of his
   fall, was under the influence of alcohol, and that this substantially

19  contributed to the cause of the accident that led to his death.

20

21

22  52.  Fe Simonette's counsel sent another letter to Lincoln dated November

23  10, 2022, which discussed the many flaws of Dr. Pietruszka's analysis of the video

24  clips and his reasoning as to how he arrived at his final opinion.  The letter

25  discussed Dr. Pietruszka's opinion of each video clip and noted that his assessments

26  were grossly inaccurate, blatantly mischaracterized what the videos actually depict,

27  and used vague language such as "fumbling around" and "appears to be 'out of it'"

28  without explaining what he meant or how he made such determinations.

Case No.:



53.     In response to the November 10, 2022 letter Lincoln sent a letter dated November 14, 2022 stating that Lincoln had conducted a full and fair review of Fe Simonette's appeal and rendered a final decision in its October 19, 2022 letter upholding its denial of AD&D benefits.  Lincoln did not address the discussion of the video clips in the November 10, 2022 letter sent by Fe Simonette's counsel. Because Lincoln did not consider Plaintiff's November 10, 2022 letter, it did not give her a full and fair review.  As amended in 2018, the ERISA claims regulations  provide that relative to an appeal of an adverse benefit determination, a "full and fair review" requires that, "before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim." 29 C.F.R. § 2560.503–1(h)(2), (h)(4)(i).  Any "such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided . . . to give the claimant a reasonable opportunity to respond prior to that date." *Id*. at (h)(4)(i).

54.     Doru suffered a severe traumatic head injury, an intracerebral hemorrhage, when he accidentally fell and struck his head with great force on the floor, due to which internal brain tissue bleeding caused him to die.  Doru did not die due to his alcoholism or any other health condition; any preexisting conditions were, at most, minor contributing factors, not substantial ones.  Despite this being supported by overwhelming evidence, Lincoln still denied Fe Simonette's claim, which was incorrect and improper for several reasons, as follows.

55.     First, Lincoln's decision to deny Fe Simonette's claim was based on

Case No.:

inaccurate information.  For example, Fe Simonette explained to the paramedics that Doru had a history of chronic alcoholism, but Doru's medical records indicate that Fe Simonette told the paramedics that Doru had a particularly heavy night of drinking the previous night.  That Fe Simonette told the paramedics this and that Doru had drank any more than normal that night are both patently false.  The medical records also indicate that Fe Simonette noted that Doru had expressed suicidal ideation the day before his fall, which is also patently false.  Doru had communicated to Fe Simonette that he had experienced an eerie sensation that he was going to die in the very near future.  Doru was deeply religious and the concept of suicide was unfathomable to him.  Fe Simonette explained in a personal statement that the medical records inaccurately reflect her statement.  However, Lincoln's review of Fe Simonette's claim took these inaccuracies as true and applied them to its analysis, which resulted in an inaccurate conclusion.

56.     Second, Lincoln based its conclusions on generalities and false assumptions, as noted above.  Lincoln reasoned that because alcohol use *can possibly* lead to an increased risk of hemorrhage, and Doru suffered from a hemorrhage, his hemorrhage was therefore conclusively caused by his use of alcohol.  Lincoln's analysis was based on the effects of alcohol on a hypothetical person, and not on Doru in particular.  Given Doru's high functional tolerance of alcohol, this is a significant factor that Lincoln needed to have included in its analysis but failed to consider.

57.     Third, Lincoln's analysis of Doru's medical records was incorrect and conclusory, and misrepresented the evidence.  Lincoln disregarded Fe Simonette's corrections of the misstatements in the medical records and completely ignored Doru's liver enzyme levels and activity.  These flaws permeated Lincoln's review of Doru's records and resulted in Lincoln improperly denying Fe Simonette's claim for

Case No.:



1   AD&D benefits.

2

3       58.     Fourth, Lincoln's analysis of the basic facts of the matter was fatally

4   substandard.  Dr. Pietruszka grossly misstated the contents of the video clips and

5   Lincoln based its decision to uphold its denial of AD&D benefits on Dr.

6   Pietruszka's opinion.

7

8       59.     Fifth, Doru did not die suddenly, but rather, his hemorrhage continued

9   to worsen over the course of more than three days after his fall, leading to his death.

10  Clearly, Doru's death was caused by the intracerebral hemorrhage, which resulted

11  from his fall.  Given Dr. Nafziger's expert opinion, Lincoln had no basis to conclude

12  that Doru's fall was caused by his consumption of alcohol.  Therefore, Lincoln

13  cannot justifiably assert that Doru's death was caused by his consumption of

14  alcohol.

15

16      60.     Sixth, Doru had been consuming alcohol regularly for over 40 years.

17  In that time, **he had no history of ever falling**, bumping into anything, stumbling,

18  or in any other way losing control of his faculties, due to his consumption of

19  alcohol.  Doru regularly interacted with numerous people, several of whom have

20  submitted personal witness statements confirming that Doru functioned normally,

21  did not ever appear to be intoxicated or display any signs of impairment, and never

22  had any incident where he fell or stumbled due to alcohol.

23

24      61.     Seventh, Lincoln used the wrong standard for intoxication in California

25  when it relied on its Policy provision and not on California Insurance Code Section

26  10369.12, the intoxication exclusion language, that must appear in all AD&D

27  policies issued to California residents such as Doru and Fe Simonette (or language

28  that is not less favorable to the insured).  This definition supplants the Policy's



1    intoxication exclusion as a matter of law.  Lincoln failed to note this or take this

2    definition into account.

3

4         62.     *Ciberay v. L-3 Commc'ns Corp. Master Life & Acc. Death &*

5    *Dismemberment Ins. Plans*, 2013 WL 2481539 (S.D. Cal. 2013) is virtually identical

6    to this matter and controls here.  There, the decedent, Mr. Ciberay, died nine days

7    after fracturing his pelvis when he fell down a flight of stairs.  At the time of his fall,

8    Mr. Ciberay was extremely intoxicated, with a BAC of .422 mg/dL or .422% (well

9    over twice the level of Doru's intoxication level when it was measured).  Mr.

10   Ciberay had a history of chronic alcohol dependence.  The medical examiner's

11   report listed the cause of death as complications following pelvic fractures, with

12   other significant conditions of hypertensive cardiovascular disease, alcohol abuse,

13   obesity, and diabetes mellitus.  The manner of death was characterized as an

14   "accident."  Mrs. Ciberay's claim was denied on the basis that it was excluded from

15   coverage because Mr. Ciberay's death was "not the direct result of a bodily injury

16   caused by an accident resulting directly and independently from all other causes, but

17   was caused in whole or in part by, or resulting in whole or in part from being under

18   the influence of intoxicants."  The court explained that California Insurance Code

19   Section 10369.12 is one of eleven standard provisions that must be directly inserted

20   into insurance policies delivered in California unless the insurer gets approval from

21   California's insurance commissioner to use alternate, though not less favorable,

22   wording.  The court then stated that Section 10369.12, the intoxication exclusion,

23   must supplant the Policy's intoxication exclusion language, which stated:

24
        Intoxicants and controlled substances:  The insurer shall not be liable
25      for any loss sustained or contracted ***in consequence of*** the insured's
        being intoxicated or under the influence of any controlled substance
26      unless administered on the advice of a physician.  (Emphasis added.)
27

28   Applying Section 10369.1, the court concluded the language of Section 10369.12

Case No.:

differs from the policy's intoxication exclusion because, while Section 10369.12 excludes "any loss sustained or contracted in consequence of the insured's being intoxicated," the policy excludes "any loss caused in whole or in part by, or resulting in whole or in part from, […] the Insured Person being under the influence of drugs or intoxicants." *Id.* at *12. The court stated that a loss that is caused or results "in whole or in part" from intoxication is more expansive than a loss that is "in consequence of intoxication." *Id.* Importantly, the court held that, "This conclusion alone dictates a finding that Defendant abused its discretion by failing to consider the appropriate standard in considering Plaintiff's claim." *Id.* The language "in consequence of" is to be interpreted to mean "the proximate cause." *See Olson v. American Bankers Ins. Co.*, 30 Cal.App.4th. 816, 828 (1994). The efficient proximate cause is the cause that sets the others in motion, or the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster. *See Sabella v. Wisler*, 59 Cal.2d 21 (1963). The court ultimately found that, "Mr. Ciberay's intoxication was too remote from his death to reasonably conclude his intoxication was the efficient proximate cause of his death." *Ciberay supra* at *13. The court ultimately concluded that, "Defendant could not have reasonably decided if Mr. Ciberay's intoxication was the efficient proximate cause of his death." *Id.* at *14.

63.    *Ciberay* is directly on point here. The facts in *Ciberay* are uncannily similar to those present here. The policy exclusionary language in *Ciberay* and in the Policy here are virtually identical in substance. And the erroneous reasoning Lincoln has provided for denying Fe Simonette's claim is the same as that in *Ciberay*.

64.    The Policy exclusionary language here is more expansive than that of California Insurance Code Section 10369.12. Therefore, the Policy language must

Case No.:

be supplanted with the language of Section 10369.12.  Not only that, but pursuant to *Ciberay*, Lincoln's conclusion that Doru's death was caused by intoxication on its own dictates a finding that Lincoln abused its discretion by failing to consider the appropriate standard in considering Fe Simonette's claim.

65.     The proper standard of review is de novo.  Any grant of discretionary authority contained in the Policy is void in light of California Insurance Code Section 10110.6.  Fe Simonette and Doru were California residents at all times relevant.  The Policy was renewed after January 1, 2012, the date on which the statute became effective.  Lincoln rendered its benefits decision after that date.  Accordingly, the denial of benefits at issue must be reviewed de novo.

66.     Regardless of the standard of review that this Court applies, Lincoln reached an incorrect benefit decision by refusing to pay Fe Simonette's claim for AD&D benefits.

67.     Plaintiff exhausted her administrative remedies under the Plan and has the right to bring a legal action for benefits and equitable relief under ERISA section 502(a).  Lincoln's November 14, 2022 letter stated that Fe Simonette "has exhausted her administrative remedies under ERISA."

## **FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees and Pre-Judgment Interest under

ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Lincoln and Does 1 through 10)

68.     Mrs. Muncan incorporates by reference each of the foregoing paragraphs of this Complaint, as though fully set forth herein.

Case No.:

69.     ERISA section 502(a)(1)(B), 29 U.S.C. section 1132(a)(1)(B), permits plan beneficiaries like Mrs. Muncan to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

70.     At all relevant times, Fe Simonette has been entitled to AD&D insurance benefits under the Plan in the amount of $300,000 as her husband, Doru's designated beneficiary following his death.  By denying Mrs. Muncan's claim for unpaid AD&D insurance benefits in the amount of $300,000, and by related acts and omissions, Lincoln violated, and continues to violate, the terms of the Plan and Mrs. Muncan's rights thereunder.

71.     Lincoln has failed to follow claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. section 1133(2).  Thus, even if the Plan vests discretion in Lincoln to make benefit determinations, no deference is warranted with regard to Lincoln's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

72.     Mrs. Muncan is informed and believes, and on that basis alleges that Lincoln is both a funding source and claims fiduciary of the Plan, and thus has a structural conflict of interest.  Therefore, even assuming that the Plan vests any discretion in Lincoln to make benefit determinations, review of such determinations by this Court must take into consideration all the relevant facts and circumstances in determining if there is an abuse of discretion.

73.     A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the participants and beneficiaries of the Plan.  *See* 29 U.S.C. § 1104(a)(1).  Under ERISA: (1) a fiduciary must perform its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the plan on behalf of a party whose interests are adverse to the interests of the plan, its participants or its beneficiaries.  Lincoln's handling of Mrs. Muncan's claim for AD&D benefits fell far short of these standards.

74.     For all the reasons set forth above, the decision to deny AD&D insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and contrary to law.  Lincoln improperly denied this claim as the evidence shows its denial decision was not only incorrect but, arbitrary and capricious.  Further, Lincoln's denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Lincoln's denial of Mrs. Muncan's claim was incorrect, improper and an abuse of discretion.

75.     Based upon all of the evidence discussed above, Mrs. Muncan has met the burden of establishing on a de novo review that she is entitled to AD&D benefits under the Plan in the amount of $300,000 and that Lincoln's denial of Mrs. Muncan's claim was incorrect and improper.

76.     A court must construe ambiguities in an ERISA plan against the drafter

1    and in favor of the reasonable expectations of the insured/plan participant.  *See*

2    *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 942

3    (9th Cir. 1995); *Barnes v. Indep. Auto. Dealers Ass'n Health & Benefit Plan*, 64

4    F.3d 1389, 1393 (9th Cir. 1995).

5

6         77.    Further, an insurer/claims administrator wishing to avoid liability on

7    a policy must make exclusionary and other limiting clauses conspicuous, plain and

8    clear, placing them in such a fashion as to make obvious their relationship to other

9    policy terms, and must bring such provisions to the attention of the insured.  *See*

10   *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 386-87 (9th Cir. 1994);

11   *cf. Kunin v. Benefit Trust Life Ins. Co*., 910 F.2d 534, 540 (9th Cir. 1990) (The state-

12   law principle of contra proferentem applies to the federal courts' interpretation of

13   ERISA insurance contracts; in the context of interpreting ambiguous provisions,

14   "the insurer should be expected to set forth any limitations on its liability clearly

15   enough for a common layperson to understand.").  In general, courts will protect the

16   reasonable expectations of applicants, insureds and intended beneficiaries regarding

17   the coverage afforded by insurance carriers even though a careful examination of the

18   policy provisions indicates that such expectations are contrary to the expressed

19   intention of the insurer.  *Saltarelli*, *supra* at 386 ("Protecting the reasonable

20   expectations of insureds appropriately serves the federal policies underlying ERISA,

21   including provision of adequate information to plan participants and protection of

22   their interests.")[1]

23

24   _____

[1] ERISA's statutory declaration of policy, 29 U.S.C. Section 1001(a), states that

25   "owing to the lack of employee information and adequate safeguards concerning
     their operation, it is desirable in the interests of employees and their beneficiaries

26   . . . that disclosure be made and safeguards be provided with respect to the
     establishment, operation, and administration of such plans."  It continues:

27        It is hereby declared to be the policy of this chapter to protect . . .

28        the interests of participants in employee benefit plans and their

                                                      Footnote continues on next page…

Case No.:

78.    At a minimum, Lincoln failed to consider Plaintiff's November 10, 2022 letter and thus it did not give her a full and fair review.  This Court should remand the matter to Lincoln to consider her letter.

79.    As a direct and proximate result of the denial of her claim for accidental death benefits, Mrs. Muncan has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 20 U.S.C. § 1132(g)(1).

80.    Mrs. Muncan alleges all of the same conduct against Defendants Does 1 through 10 as she does against Defendant Lincoln in this First Claim for Relief and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Mrs. Muncan prays that the Court grant the following relief against all Defendants:

1.    For all Plan benefits due and owing Mrs. Muncan, including the unpaid AD&D insurance benefit of $300,000;

2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. section 1132(g);

3.    For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir.

---

beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).

Case No.:



1    2007) ("A district court may award prejudgment interest on an award of

2    ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*,

3    977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Mrs. Muncan seeks

4    interest at the rate of 10% per annum, pursuant to California Insurance

5    Code section 10111.2, or any other rate permitted by law; and

6    4.    For such other and future relief as this Court deems just and proper.

7

8

9    Dated:  January 23, 2022                    MCKENNON LAW GROUP PC

10

11   By: _____

12   ROBERT J. McKENNON
     JOSEPH S. McMILLEN
13   CORY T. SALISBURY
     Attorneys for Plaintiff Fe Simonette
     Muncan

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-30-                                                Case No.:

